IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SICK, INC.                                     :
                                               :
         v.                                    :   Civil No. CCB-11-2890
                                               :
21ST CENTURY SOFTWARE, INC.                    :

# MEMORANDUM

This case arises from a dispute over a contract with the United States Postal Service ("USPS"). The parties, Sick, Inc. ("Sick") and 21st Century Software, Inc. ("21st Century"), both bid on a contract to provide engineering services for an automated sorting system used by the USPS. The USPS initially awarded the contract to Sick, but then rescinded the award when Sick was unable to confirm the involvement of key personnel identified in its bid. The contract was subsequently awarded to 21st Century for a higher amount. Sick alleges that 21st Century wrongfully lured away the individuals listed in Sick's bid with the purpose of causing USPS to withdraw the award from Sick. Sick also alleges that 21st Century falsely represented to the USPS that Sick had listed key personnel in its bid without the individuals' prior consent. Sick has brought suit against 21st Century for tortious interference with prospective business relations and tortious interference with contract; Sick also seeks injunctive relief. 21st Century has filed a Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment. (ECF No. 44.) 21st Century has also moved for sanctions against Sick, pursuant to Federal Rule of Civil Procedure 11. (ECF No. 65.) For the reasons set forth below, the court will grant 21st Century's

1

motion for summary judgment and deny its motion for sanctions. The court also will deny the pending motions to seal, except as to Sick's contract bids, which may contain sensitive pricing information and therefore will remain under seal.

## Background

The contract at issue involves the provision of software engineering services for the USPS's Flats Sequencing System ("FSS"). The USPS originally contracted with Northrop Grumman to develop the software, but Northrop Grumman subsequently declined a contract to maintain the software. In March 2011, USPS issued a request for proposals ("RFP") for companies interested in contracting to maintain the FSS. (Answer, ECF No. 39, Exh. A.)

The USPS emphasized in its RFP that each bidder would be required to identify the key personnel who would provide services under the contract. A supplier could seek written approval from USPS to substitute key employees, but the USPS would retain the option to "terminate[] [the agreement] if the key personnel named in the supplier's proposal become unavailable for any reason." (*Id.*)

The USPS invited both Sick and 21st Century to bid for the contracts as "prequalified candidates." Both parties submitted bids on May 12, 2011. Both bids listed as "key personnel" several individuals who had worked for Northrop Grumman on the original FSS contract. (Complaint, ECF No. 1, at ¶ 13.) Those key personnel included Manfred Foxx ("Mr. Foxx") and Veronika Gospodareva ("Ms. Gospodareva"), who were identified in Sick's complaint, as well as Justin Nussio ("Mr. Nussio"), Dan Teodosescu ("Mr. Teodosescu"), and Vladimir Fridman ("Mr. Fridman"), whom Sick identified in its opposition to 21st Century's motion for summary judgment. According to Sick, Mr. Foxx and Ms. Gospodareva, as well as the rest of the key

personnel identified in Sick's bid, gave prior consent to be included in Sick's bid and to perform the work if Sick won the contract. As evidence of this, they rely on affidavits from Sick executives Rob Stone and Mohammed Islam, as well as the fact that some prospective employees submitted resumes to Sick during initial communications about the bid.

On June 8, 2011, USPS awarded Sick the contract. Sick alleges that on June 9 or 10, 21st Century met with "at least some of the key personnel" identified in Sick's bid. (Compl., at ¶22.) Shortly after that meeting, Mr. Foxx and Ms. Gospodareva sent "virtually identical emails to the USPS, indicating that they would not agree to work on the Contract with Plaintiff as the winner." (*Id.* at ¶23.) Several other key personnel made similar representations, expressing their unwillingness to work with Sick and referencing their pre-existing commitments to work exclusively with 21st Century.

On June 15, 2011, Sick signed the written agreement and returned it to the USPS. The following day, the USPS asked Sick to confirm the availability of its key personnel. Because Sick could not secure the involvement of the key personnel named in its bid, Sick instead "identified additional staffing to replace key personnel." (*Id.* at ¶31.) The USPS rescinded its award and subsequently awarded the contract to 21st Century on July 6, 2011. The total amount of the contract rose from $5,800,320 to $7,224,934. Several individuals identified in Sick's original bid are now working with 21st Century on the FSS contract.

In its complaint, Sick alleges that 21st Century wrongfully lured away the individuals named in Sick's bid with the express intention of causing the USPS to withdraw the award from Sick and grant it to 21st Century. Sick characterizes 21st Century's actions as "poach[ing]." (*Id.*) As evidence of 21st Century's concerted effort to undercut Sick's award, Sick points to a June 15, 2011, email from 21st Century executive David Joyce to the USPS, on which Mr. Foxx, Ms.

Gospodareva, and other key personnel were copied. The email stated that "[a]s you are probably aware by now, SICK and Rob Stone has [sic] won the software Maintenance contract." (ECF No. 45-1, Exh. C at 19.) Mr. Joyce instructed the key personnel, "based on [their] conversation yesterday," to "answer the call from Rob Stone and turn down his offer." (*Id*). Mr. Joyce directed the individuals to "[c]ut the letter I have drafted below and send it to [USPS executive] Mark Travers . . . as well as Rob Stone . . . ." (*Id.*) Sick argues that this email, as well as subsequent emails which corroborate the sequence of events,[1] support the inference that 21st Century sabotaged Sick's bid by encouraging key personnel to turn down Sick's employment offer.

Sick also alleges that 21st Century made false representations to USPS which were "intended only to cause USPS to terminate the Contract with [Sick] and award it to [21st Century]." (Compl., at ¶25.) In an email dated June 14, 2011, Mr. Joyce sent USPS officials copies of the exclusive employment agreements between 21st Century and several of the key personnel listed in both bids. (ECF No. 45-1, Exh. C, at 17.) Mr. Foxx, Ms. Gospodareva, and others were copied on the email. In a letter attached to the email, Mr. Joyce represented to the USPS that the key personnel had "asked not to be submitted by the competitor" (presumably alluding to Sick), but the company "decided to submit their names without approval." (*Id.* at 18.) Mr. Joyce stated that he had "included each person on this email and they are all committed to not working on this program if 21st Century does not succeed in winning the proposal." (*Id.*) Based in part on this evidence of 21st Century's direct communications to the USPS about the availability of key personnel, Sick argues "the key personnel's change of heart was based on the

---

[1] In another email, dated June 17, 2011, Mr. Nussio explained to Mr. Joyce that he "didn't send the same email [that Joyce had] sent," but rather "decided to send something more from me rather than the company approach." (ECF No. 54-3, at 2.) His email to the USPS, which he pasted in the email to Mr. Joyce, stated that he had "no personal grievance with Mr. Stone or SICK Inc.," but was "committed with the group that formed 21st Century Software's bid." (*Id.*)

wrongful actions of [21st Century]," and Sick's damages from losing the USPS contract are therefore attributable to 21st Century. (Memo. Opp. to Motion for Summ. Judgment, ECF No. 45, at 5.)

For its part, 21st Century does not deny that it entered into employment agreements with the same individuals named in Sick's bid. Moreover, 21st Century does not deny informing the USPS that it had exclusive employment agreements in place with those individuals.[2] Rather, 21st Century denies that any of its actions were wrongful, deceitful, or in any way tortious. 21st Century claims that, like Sick, it identified Ms. Gospodareva and Mr. Foxx, among others, as key personnel in its bid. 21st Century maintains that its representations to the USPS were both true and proper. In support of this contention, 21st Century has submitted to the court agreements with several key personnel, including Ms. Gospodareva and Mr. Foxx, which were signed on May 24, 2011 and May 25, 2011 – after both parties had submitted bids and before USPS made any offers or awards. The agreements "verify the intent of the signed person to exclusively bid on the USPS software maintenance contract with 21st Century Software for the upcoming contract to be awarded for June 2011 thru June 2014." (ECF No. 39, Exh. B.) 21st Century maintains it had the right to engage the key personnel, especially because the employment agreements predated any awards by the USPS. Moreover, the record shows that 21st Century had pre-existing employment relationships with several key personnel.[3]

---

[2] 21st Century claims to have forwarded copies of its exclusivity agreements to USPS on May 25, 2011 "as a supplement to [its own] bid proposal." (Motion for Summ. Judgment, ECF No. 44, at 3.)
[3] For example, Mr. Fridman stated that he used to work "as a contractor for Northrup Grumman . . . *through 21st Century* on its [USPS] project related to the original FSS contract." (Fridman Affidavit, ECF No. 57, at 1) (emphasis added). Likewise, Mr. Teodosescu stated that he worked "through 21st Century as contractor for Northrop Grumman." (Teodosescu Affidavit, ECF No. 47, at 1.) Ms. Gospodareva and Mr. Nussio made similar representations. (Gospodareva Affidavit, ECF No. 51, at 1; Nussio Affidavit, ECF No. 54, at 1.)

Finally, 21st Century contests Sick's argument that summary judgment should be denied because further discovery is warranted. Sick argues it requires "facts which are within [21st Century's] sole control, and which [21st Century] should produce in response to [Sick's] interrogatories." (Memo. Opp. to Summ. Judgment, ECF No. 45 at 3.) Sick contends it is entitled to depose the key personnel and that 21st Century has "withheld discovery materials," including communications between 21st Century and key personnel.[4] (*Id.*) 21st Century maintains that it has "provided all written discovery," and "there are simply no more documents in [its] possession . . . that relate to this matter." (Reply Memo. in Support of Summ. Judgment, ECF No. 46, at 9.)[5]

## Motion for Summary Judgment

Because the parties rely extensively on the documentary record, the court will construe 21st Century's motion as a motion for summary judgment, not judgment on the pleadings. Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise

---

[4] According to Sick, for example, "the discovery contains no documents between the key personnel and Defendant from the time period of March 30, 2011, until June 14, 2011, when they must have communicated during that time, specifically, surrounding the key personnel's signing of the alleged 'exclusivity agreements' on May 25, 2011." (Memo. Opp. to Motion for Summ. Judgment, ECF No. 45, at 3.)

[5] 21st Century also argues that Sick until recently withheld relevant documents, including emails which "directly contradict[] Sick's allegations in the Complaint." (Reply Memo. in Support of Summ. Judgment, ECF No. 46, at 9.)

properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

*Tortious Interference with Contract and Tortious Interference with Economic Relations*

21st Century has asserted claims for tortious interference with business relations and tortious interference with contract. "The tort, which has two general manifestations . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Associates*, 334 Md. 287, 297 (1994) (internal citations omitted). "While the two manifestations of the tort share an underlying rationale, *i.e.,* 'under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation,' they differ in their tolerance of interference." *Id*. at 298. Maryland courts have held that "where a contract between two parties

7

exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69-70 (1984).

As an initial matter, the court concludes that the appropriate tort for consideration in this case is tortious interference with economic relations, not tortious interference with contract. The parties dispute whether a contract between the USPS and Sick was formed on June 15, 2011, when Sick signed and returned the written agreement to the USPS. 21st Century argues that no contract was ever formed, and the record indicates that the USPS shares that view. In an email exchange between a USPS official and Mr. Stone on the day after Sick returned the executed agreement, the USPS stated "just to reiterate our conversation of this morning, a contract can only be established if the document is countersigned by the Postal Service." (ECF No. 61, Exh. G.) Sick replied "[i]t is our opinion that SICK has a contract with USPS. A contract was issued to SICK and we executed it." (ECF No. 61, Exh. H.) The USPS countered that Sick's "interpretation is incorrect" and noted that it had "continuously stressed to [Sick] that there is no contract . . . until certain conditions are met." (ECF No. 61, Exhs. H, K.) In the same email exchange, the USPS set a deadline for Sick to "confirm the availability of the key personnel." (ECF No. 61, Exh. I.) After receiving Sick's response, the USPS stated that Sick "did not provide the level of commitment required" and that it would be "moving on with discussions with other suppliers." (ECF No. 61, Exh. K.)

The court finds it unnecessary to determine whether the USPS and Sick formed a contract on June 15, 2011, because the tort of interference with contract would not apply in any event. Sick's primary complaint is that 21st Century falsely represented to USPS that (1) it had

8

exclusive employment agreements in place with the key personnel listed in Sick's bid, and (2) Sick had not obtained the prior consent of those individuals before identifying them in its bid. Even assuming, for the purposes of summary judgment, Sick's allegations are true, 21st Century's representations to the USPS were made on June 14, 2011 – before the contract was allegedly executed. (ECF No. 45-1, Exh. C at 18.) Likewise, any "poaching" of employees by 21st Century would have taken place before the formation of a contract between the USPS and Sick. The record, for example, contains exclusivity agreements signed on May 24 and May 25, 2011. (ECF No. 39, Exh. B.) Accordingly, the tort of interference with contract does not apply because, at the time of the conduct in question, there was no contractual relationship between the parties. *See Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991) (plaintiff seeking to prevail on tortious interference with contract must establish the "existence of a contract between plaintiff and a third party").

With respect to the claim of tortious interference with business relations, Maryland courts have held that a plaintiff must establish the following elements:

> (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Lyon v. Campbell*, 120 Md. App. 412, 431 (1998) (quoting *Willner v. Silverman,* 109 Md. 341, 355 (1909)). Importantly, "[t]o establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct." *Macklin*, 334 Md. at 301 (internal citations omitted). "A plaintiff may prove tortious intent by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the expense of the plaintiff." *Id.* However, "[t]ortious or deliberate intent to harm a plaintiff's business relationship is not alone

sufficient to support an intentional interference claim." *Lyon*, 120 Md. App. at 431.  A plaintiff must also establish interference "by *conduct that is independently wrongful or unlawful*." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 348 (4th Cir. 2006) (emphasis in original) (internal quotations and citations omitted).  Maryland courts have "identif[ied] such conduct as violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (internal quotations omitted).

The focus on whether a defendant's conduct is justified or proper reflects the law's recognition that "just cause for damaging another in his business is competition." *Natural Design, Inc.,* 302 Md. at 72.  Otherwise stated, "acting to pursue one's own business interests at the expense of others is not, in itself, tortious." *Alexander & Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 654 (1994).  Accordingly, "interference with another's contract or business relations in the name of competition is improper only if the means used are, in themselves, improper." *Macklin,* 334 Md. at 302.

In the view of this court, vying for the exclusive employment of individuals listed in one's bid is not improper – even if a competitor is trying to secure the same employees.  Rather, such conduct would be considered wrongful only if it involved some form of active deceit or deliberate misrepresentation.  To that end, the parties have provided contradictory testimony about whether 21st Century falsely represented to the USPS that Sick had not obtained the prior consent of the employees it identified in its bid. Mr. Islam, Sick's Vice President of Postal Integrated Solutions, stated in a sworn affidavit that he "talked with key individuals before submitting Sick's proposal for the Contract, including Manfred Foxx ('Foxx'), Veronika Gospodareva ('Gospodareva'), Justin Nussio ('Nussio'), Dan Teodosescu ('Teodosescu'), and

Vladimir Fridman ('Fridman')." (ECF No. 45-3.) Mr. Islam further attested that "before the proposal, each of these individuals agreed that if Sick won the Contract, they would work for Sick." (*Id*.) Mr. Stone attested that he spoke with Mr. Teodosescu and Mr. Fridman in advance of submitting Sick's bid, and both men agreed to work for Sick if it won the contract. (ECF No. 45-2.) Mr. Stone also stated that Mr. Islam told him in March and April 2011 that Mr. Foxx, Ms. Gospodareva, Mr. Fridman, and Mr. Teodosescu had "agreed that if Sick won the contract, they would work for Sick." (*Id*.)

By contrast, the individuals themselves uniformly deny they agreed to work for Sick. In an affidavit submitted to the court, Mr. Foxx attested that he knew 21st Century had listed him as one of the key personnel, but he had never agreed to work for Sick or to be listed on its bid. (ECF No. 44-3 at 1.) Mr. Foxx stated that he "was approached by Sick, Inc. . . . only after they were allegedly awarded the contract on June 14, 2011," and he notified Sick on June 15 that he "was not willing to work with Sick." (*Id.* at 2.) Likewise, Ms. Gospodareva stated that while she had agreed to be in 21st Century's bid before it was submitted, she "did not agree to work with [Sick] prior to their bid submission." (ECF No. 44-2 at 2.) She attested that she learned she "had been listed as key personnel without [her] knowledge" around June 14, 2011, and subsequently "communicated to USPS that [she] was not willing to work with Sick." (*Id.*)[6]

The evidence in this case does not support an inference that 21st Century acted wrongfully. Even viewing the evidence in the light most favorable to Sick and therefore assuming that Sick *did* obtain the prior consent of the key personnel before listing them on its

---

[6] Mr. Nussio stated that he understood he would be identified in 21st Century's bid, but "never gave anyone else permission to include [his] resume with their proposal or promised to work with anyone else if they were awarded the contract, including Sick." (Nussio Affidavit, ECF No. 54, at 2.) Mr. Teodosescu and Mr. Fridman made substantially similar attestations. (Teodosescu Affidavit, ECF No. 47, at 1; Fridman Affidavit, ECF No. 57, at 2.)

bid,[7] there is no evidence to suggest that 21st Century actively deceived the USPS or deliberately misrepresented the facts. To the contrary, the evidence in the record suggests the key personnel told 21st Century officials they had not consented to work for Sick and 21st Century, in turn, communicated that information to the USPS. Communicating information that reflects poorly on a competitor with the intent of boosting one's own chances to win a contract may support an inference of tortious *intent*, but unless the representation was deceitful or unlawful, it is not independently wrongful. *See Macklin,* 334 Md. at 302 ("Simply because a person induces another to exercise an existing right to terminate a contract, even if that person's intention with regard to one of the parties to the contract is tortious, does not make it actionable. That is, his or her conduct is not thereby rendered improper or wrongful as a matter of law.").

In any event, the court need not rely on an assessment of wrongfulness to conclude that summary judgment is warranted. Even if further discovery were to reveal that (1) Sick did obtain the prior consent of the key personnel, (2) 21st Century knew Sick had obtained that consent, and (3) 21st Century intentionally communicated false information to the USPS, Sick's tort claims would nonetheless fail for lack of causation. "In order to establish causation in a wrongful interference action, the plaintiff must prove that the *defendant's wrongful or unlawful act* caused the destruction of the business relationship which was the target of the interference." *Medical Mutual Liab. Soc. of Maryland v. B. Dixon Evander & Associates, Inc.*, 339 Md. 41, 54

---

[7] Evidence in the record suggests that 21st Century's representations may be accurate. Sick clearly communicated with key personnel about participating in its USPS bid. *See, e.g.,* ECF No. 58-1, Exh. A (emails between Mr. Fridman and Mr. Islam about possible work with Sick); ECF No. 48-2, Exh. D (email to Mr. Islam from Mr. Teodosescu stating that he would "take [his] time and wait until things settle down before making a decision" about whether to work with Sick). There is no indication in the record, however, that any of the individuals with whom Sick communicated agreed to be identified in Sick's bid. Indeed, the individuals themselves deny they consented. *See supra* note 5. By contrast, there is ample evidence that the key individuals agreed to be identified in 21st Century's bid. *See* ECF No. 47-3 (email from Ms. Gospodareva to 21st Century attaching her resume and directing Mr. Joyce to "be free to include it in [21st Century's] proposal"); ECF No. 55-1, Exh. A (email from Mr. Nussio to 21st Century attaching his resume in response to email from David Joyce about requirements of the FSS contract).

(1995) (emphasis added). Of course, "the matter of causation [does not have] to be proved by direct and positive proof to an absolute certainty." *Lyon*, 120 Md. App. at 437 (internal quotations omitted). However, "the burden is on the plaintiff to prove by a preponderance of the evidence that it is more probable than not that defendant's act caused his injury." *Medical Mutual,* 339 Md. at 54 (internal quotations omitted).

In this case, the evidence does not permit the reasonable inference that 21st Century's allegedly wrongful conduct caused the USPS to rescind its award from Sick. That is, Sick has provided no evidence to support the claim that USPS withdrew its award because 21st Century said Sick had not gained the consent of its key personnel before listing them on the bid. Rather, the cause of the rescission was Sick's ultimate inability to secure the involvement of those key individuals. Indeed, the USPS was clear from the initial RFP that failure to guarantee and maintain the involvement of key personnel identified in the bid would constitute grounds to withdraw the award or terminate the contract. (ECF No. 39, Exh. A.) The record demonstrates that the USPS reminded Sick the award was contingent on its capacity to enlist the individuals identified on its bid and expressed concern about that issue before withdrawing the award. (ECF No. 61, Exhs. I, K.) Even if 21st Century wrongfully misrepresented Sick's prior interactions with the key personnel, the rescission of the award reflected Sick's present inability to confirm the involvement of the key personnel, not the nature of its prior dealings with those individuals. Accordingly, summary judgment is appropriate because Sick has failed to establish that 21st Century's "improper or wrongful conduct . . . induce[d] the breach." *Macklin*, 334 Md. at 301-02; *see also Medical Mutual,* 339 Md. at 57 (reversing a jury verdict that imposed liability for tortious interference with business relations on the grounds that plaintiffs' evidence of causation was insufficient).

While the court will grant 21st Century's motion for summary judgment, Rule 11 sanctions are not warranted in light of the high standard that must be met, *see In re Sargent*, 136 F.3d 349, 352 (4th Cir. 1998), and the factual disputes in the record between counsel as well as between the parties. Accordingly, 21st Century's motion for sanctions against Sick will be denied.

### Motions to Seal

Finally, five motions to seal are now pending. 21st Century has moved to seal the resumes of Mr. Teodosescu, Ms. Gospodareva, Mr. Nussio, and Mr. Fridman, as well as some related affidavits and emails exchanged between those individuals and both Sick and 21st Century. (ECF. Nos. 49, 53, 56, 59.) 21st Century has also moved to seal materials related to Sick's bid for the USPS contract and communications between Sick and USPS in June 2011. (ECF No. 62.) It did so because these documents were marked as "confidential" under a confidentiality agreement between the parties.

Local Rule 105.11 requires that a party seeking to seal documents offer reasons supported by specific factual representations justifying the sealing and an explanation for "why alternatives to sealing would not provide sufficient protection." Local Rule 105.11 (D. Md. 2011); *see Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 120-21 (D. Md. 2009). In evaluating a motion to seal, the court must weigh the right of public access, which "derives from two independent sources: the common law and the First Amendment." *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). "A district court must then weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific

supporting findings) for its decision and the reasons for rejecting alternatives to sealing." *Id.* at 576.

In this case, neither party has provided any reason why this information is sensitive or warrants protection from public view. Having considered the documents, the court sees no justification for sealing the email and letter communications, resumes, or affidavits submitted with 21st Century's Reply Memorandum in Support of Motion for Summary Judgment. The court will, however, direct that Sick's bid materials that include pricing information remain sealed. The document labeled "Pricing Disclosure and Cost Volume Structure" contains pricing rates and markup information. (ECF No. 61, Exh. B.) Such materials may represent a "compilation of information" that gives Sick "an opportunity to obtain an advantage over competitors" and therefore may be considered to be trade secrets that provide the requisite compelling government interest. *See Minter*, 258 F.R.D. at 122 (quoting 3 Jack B. Weinstein, *Weinstein's Federal Evidence* § 508.04 (2d ed. 2009)). Moreover, the court has not relied on those documents in reaching its decision to grant summary judgment.

A separate Order follows.


August 22, 2012                                /s/
    Date                          Catherine C. Blake
                                  United States District Judge